UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AQUAPAW BRANDS LLC,<br><br>Plaintiff,<br><br>v.<br><br>PUSIFICA, *et al.*,<br><br>Defendants. | Civil Action No.<br>23-cv-538 |

# OPINION

Before the Court is Plaintiff Aquapaw Brands LLC's ("Aquapaw") Motion to Amend the Final Default Judgment and Permanent Injunction previously entered as to Defendants Cuddlez_productz, Loki Plays, and YaoXinChungShiYaoZhenShan (the "First Default Judgment Order"). ECF No. 84. In its Motion, Aquapaw asks the Court to amend the First Default Judgment Order to include the remaining Defendants in this case (collectively, the "Schedule A Defendants").[1] *Id.* Because Aquapaw has submitted additional information in support of the pending Motion which the Court did not consider in issuing the First Default Judgment Order, the Court anticipates granting different relief as against the Schedule A Defendants than the relief granted in the First Default Judgment Order. Accordingly, the Court will not amend the First Default Judgment Order, and instead will treat the instant Motion as requesting a separate default judgment and permanent injunction against the Schedule A Defendants. With that context, and for the reasons that follow, Aquapaw's Motion will be GRANTED.

---

[1] The Defendants against whom Aquapaw seeks default judgment are set forth in Schedule A to the Proposed Order Aquapaw submitted with its Motion. *See* ECF No. 84-1 at 11.

I.      **Procedural History**

Aquapaw filed its Complaint on March 28, 2023. ECF No. 2. The Complaint alleges that the Schedule A Defendants offered for sale, sold, and distributed "knock-off versions" of Aquapaw's "Slow Treater" animal feeding product. *Id.* at 2. According to Aquapaw, such actions infringe at least one claim of its patent, U.S. Patent No. 10,834,894,[2] in violation of 35 U.S.C. § 271. *Id.* at 2, 5. The Complaint also alleges that the Schedule A Defendants "reside or operate in foreign jurisdictions, or (though not foreign) redistribute products from the same or similar sources in those foreign locations." *Id.* ¶ 17. Aquapaw then moved for an order authorizing alternative service under Federal Rule of Civil Procedure 4(f)(3). *See* ECF No. 10. The Court granted in part and denied in part that motion. ECF No. 16. The Court authorized service via e-mail and website publication for any Defendant, unless Plaintiff has reason to believe that the Defendant resides in a country that has objected to Article 10 of the Hague Convention. *See id.* at ¶¶ 1–2. However, to the extent Aquapaw believed any Defendants resided in a country that has objected to Article 10 of the Hague Convention, the Court required Aquapaw to comply with Federal Rule of Civil Procedure 4(f)(1) or (f)(2) in effectuating service. *Id.* at 2. Ultimately, Aquapaw was unable to determine the addresses of the Schedule A Defendants and filed a renewed motion for alternative service under Rule 4(f)(3). ECF No. 77. The Court granted that motion, and authorized service via e-mail and website publication. ECF No. 78. Aquapaw served the Schedule A Defendants in compliance with the Court's second Alternative Service Order. ECF No. 79.

---

[2] The '894 Patent is for Aquapaw's "Slow Treater" device. The Slow Treater is an "animal feeder system" comprising "a feeding section on the obverse side . . . having a plurality of elastomeric nubs . . . wherein [the nubs] help hold food disposed therein and slow an animal's ability to lick the food therefrom," and "one or more suction cups on the reverse side to suction the animal feeder system to a surface." ECF No. 2-2 at 15.

Aquapaw also filed a motion for a temporary restraining order, *see* ECF No. 4, which the Court granted, *see* ECF No. 15.  The temporary restraining order:  (1) restrained the Schedule A Defendants from continuing their allegedly infringing activities;  (2) directed Third Party Service Providers to freeze the Schedule A Defendants' assets;  (3) authorized Plaintiff to propound expedited written discovery on the Schedule A Defendants;  and (4) set a hearing to determine whether the TRO should be converted into a preliminary injunction.  *See id.*  After a hearing, of which the Schedule A Defendants had notice but at which no Schedule A Defendant appeared, the Court converted the TRO into a preliminary injunction.  *See* ECF Nos. 29, 30.

Aquapaw has sued numerous defendants in this action.  Throughout the litigation, many parties have been voluntarily dismissed.  And as noted, the Court previously entered the First Default Judgment Order as to certain Defendants.  *See* ECF No. 70.  Only the Schedule A Defendants remain in this case.  The Schedule A Defendants did not file answers or otherwise respond to the Complaint within the time required by Federal Rule of Civil Procedure 12. Therefore, Aquapaw requested, and the Clerk entered, default against the Schedule A Defendants pursuant to Rule 55(a).  *See* ECF Nos. 82, 83.  Aquapaw has since filed the instant Motion to Amend the First Default Judgment Order, requesting that the Court include the Schedule A Defendants in the First Default Judgment Order.  ECF No. 84.  As noted above, the Court treats the instant Motion as one for a default judgment and permanent injunction that is independent of the First Default Judgment Order.

The Court directed Aquapaw to file supplemental briefing addressing the effect, if any, of the Third Circuit's opinion in *Nifty Home Products, Inc. v. Ladynana US et al*, No. 23-1332, 2024 WL 4987245 (3d Cir. Dec. 5, 2024) on the instant Motion, which Aquapaw timely did.  ECF Nos.

89, 92. Finally, the Court held oral argument on the damages requested by Aquapaw.[3] ECF Nos. 93, 94. Following oral argument, the Court ordered Aquapaw to submit additional information regarding its requested damages, which Aquapaw did. ECF Nos. 95, 96. Aquapaw's Motion is thus ripe for disposition.

## II.    Standard of Review

Before entering a default judgment, a court must "(1) determine it has jurisdiction both over the subject matter and parties; (2) determine whether defendants have been properly served; (3) analyze the Complaint to determine whether it sufficiently pleads a cause of action; and (4) determine whether the plaintiff has proved damages." *Moroccanoil, Inc. v. JMG Freight Grp. LLC*, No. 14-5608, 2015 WL 6673839, at *1 (D.N.J. Oct. 30, 2015). Once these conditions have been satisfied, the decision to grant default judgment rests primarily in the discretion of the district court. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). Three factors guide courts in the exercise of that discretion: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). Courts must treat as true all factual allegations of the complaint, except those relating to the amount of damages. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

## III.    Discussion

### A.    Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C §§ 1331 and 1338 because Aquapaw alleges violations of 35 U.S.C. § 271. And the Schedule A Defendants have sufficient minimum contacts with Pennsylvania such that the Court may exercise specific personal

---

[3] No Defendants appeared at the oral argument. ECF No. 94.

jurisdiction over them. *See D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102–03 (3d Cir. 2009) (finding that because Pennsylvania's long-arm statute permits jurisdiction based on constitutionally minimum contacts, traditional two-stage personal jurisdiction evaluation collapses into due process analysis only); *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021) (noting that minimum contacts inquiry requires assessment of whether (1) defendant purposefully avails itself of the forum state and (2) defendant's contacts with the forum "give rise to—or relate to— plaintiff's claims") (citations omitted). Specifically, the Court finds that Defendants purposefully availed themselves of the forum state because they completed sales of their products to a Pennsylvania address. ECF No. 2 ¶ 11; *see* ECF No. 12 ¶¶ 2–3. Furthermore, Defendants' contacts with Pennsylvania gave rise to (or relate to) Aquapaw's claim because Aquapaw contends that the Schedule A Defendants' sales of products into Pennsylvania violated 35 U.S.C. § 271. Accordingly, because the relationship between the Schedule A Defendants, the forum, and the litigation is sufficient to satisfy the minimum contacts requirement of the Due Process Clause, *see D'Jamoos*, 566 F.3d at 103, the Court may exercise personal jurisdiction over Defendants.

### B. Joinder

With limited exceptions not relevant here, joinder in patent cases is governed by 35 U.S.C. § 299. That section provides that accused infringers may be joined in one action only if:

> [A]ny right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process.

35 U.S.C. § 299(a)(1). Joinder is improper, however, where "accused infringers" are "joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, based solely on allegations that they each have infringed the patent or patents in suit." 35 U.S.C

5

§ 299(b). Finally, "[a] party that is an accused infringer may waive the limitations set forth in this section with respect to that party." 35 U.S.C § 299(c).

Here, the Schedule A Defendants may have already waived the limitations of § 299 by failing to appear and contest joinder (or, for that matter, any other aspect of this action). Because they have all failed to appear and litigate, the Schedule A Defendants have not been prejudiced by being forced to litigate their claims with unrelated parties. Accordingly, the Schedule A Defendants have each likely waived any challenge to joinder they may have been able to mount had they appeared and litigated this case.

Even if the Schedule A Defendants did not waive any objections to joinder under § 299 that they may have had, they are nevertheless properly joined here. In short, deciding whether a product is the "same" for purposes of joinder under § 299 entails applying a less exacting standard than simply looking to whether a defendant's product is literally identical to the product it allegedly copies. *See In re Apple Inc.*, 650 F. App'x 771, 775 (Fed. Cir. 2015) (noting that joinder under § 299(a) requires the finding of "a 'logical relationship' between the claims linking the underlying facts.") (quoting *In re EMC Corp.*, 677 F.3d 1351, 1358–59 (Fed. Cir. 2012) (applying Rule 20 and finding, "[j]oinder of independent defendants is only appropriate where the accused products or processes are the same in respects relevant to the patent.")). And defendants are "logically related" such that a plaintiff's claims against them arise out of the same transaction, occurrence, or series of transactions or occurrences when they have "engaged in direct coordination." *Doggie Dental, Inc. v. Cdoffice*, No. 2:21-CV-00271, 2021 WL 5411432, at *4 (W.D. Pa. Sept. 7, 2021) (Hornak, C.J.) (applying Rule 20).

Here, while some of the Schedule A Defendants' products are superficially different from each other's (e.g., different colors or different shapes of the rubber nubs), the products are the same in all respects relevant to the patent. *See* ECF No. 2 ¶¶ 25–27. Furthermore, joinder here is not

"based solely on allegations that [the Schedule A Defendants] each have infringed the patent or patents in suit." 35 U.S.C § 299(b). Rather, Defendants are co-conspirators in a scheme to profit by infringing on Aquapaw's patent. *See* ECF No. 2 ¶¶ 8, 11(g); *see also MGT Gaming, Inc. v. WMS Gaming, Inc.*, 978 F. Supp. 2d 647, 661 n.10 (S.D. Miss. 2013) (considering "concerted action" as a factor in determining propriety of joinder) (citing David O. Taylor, *Patent Misjoinder*, 88 N.Y.U. L. Rev. 652 (2013)); *see also* Taylor, *Patent Misjoinder*, 88 N.Y.U. L. Rev. at 713 ("[C]oncerted action appears to be a proxy for similarity of products or processes . . . Indeed, the more concerted the action, the more likely that the products are indistinguishable—and therefore, the more likely that joinder is appropriate.").

Finally, joinder here is consistent with the overall policies behind joinder mechanisms in civil proceedings—i.e., fairness, convenience, and judicial economy. *See Horton Co. v. Int'l Tel. & Tel. Corp.*, 85 F.R.D. 369, 371 (3d Cir. 1980) ("The purpose of [Rule 20 joinder] is to promote trial convenience and expedite the final resolution of disputes."); *In re EMC Corp.*, 677 F.3d at 1355 ("Rule 20's two requirements . . . help ensure that the scope of the action remains consistent with fairness to the parties.") (cleaned up). Meanwhile, severing parties now would result in unnecessary delay and prejudice to Aquapaw. Joinder of Defendants here is therefore appropriate.

### C. Service of Process

The Constitution requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Rules 4(h)(2) and 4(f)(3) of the Federal Rules of Civil Procedure together provide that a party may serve an individual or a business entity at a place not within any judicial district of the United States by means not prohibited by international agreement.

Here, the Court authorized alternative service of the Schedule A Defendants because Aquapaw was unable to locate their addresses despite diligent efforts. *See* ECF Nos. 77, 78. The Court found that service by e-mail and website publication was reasonably calculated to apprise the interested parties of the pendency of this action and afford them an opportunity to present their objections. *See* ECF No. 78. Aquapaw effectuated service on the Schedule A Defendants in accordance with that Order. *See* ECF No. 79. Finally, service by e-mail and website publication is not prohibited by international agreement. *See Henry F. Teichmann, Inc. v. Caspian Flat Glass OJSC*, No. 2:13-cv-458, 2013 WL 1644808, at *1–2 (W.D. Pa. Apr. 16, 2013) (Hornak, C.J.); *see also Stat Med. Devices, Inc. v. HTL-Strefa, Inc.*, No. 15-cv-20590, 2015 WL 5320947, at *3–4 (S.D. Fla. Sept. 14, 2015); *FTC v. PCCare247 Inc.*, No. 12-cv-7189, 2013 WL 841037, at *4 (S.D.N.Y. Mar. 7, 2013). Therefore, service was proper in this case.

### D. Statement of a Claim for Patent Infringement

To state a claim for patent infringement, a pleading must (1) allege ownership of the patent; (2) name each defendant; (3) cite the patent that is allegedly infringed; (4) state how the defendant allegedly infringes upon the patent; and (5) point to the sections of the patent law invoked. *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1362 (Fed. Cir. 2013). Here, Aquapaw (1) alleges ownership of the patent, ECF No. 2 ¶ 1; (2) names each allegedly infringing Defendant, *id.* ¶¶ 17–25; (3) cites the patent that is allegedly infringed, *id.* ¶ 7; (4) states how each Schedule A Defendant allegedly infringed, *id.* ¶ 44; and (5) points to the sections of the patent law invoked, *id.* ¶ 45. Aquapaw has therefore stated a claim for patent infringement.

### E. *Chamberlain* Factors

First, Aquapaw would be prejudiced if default judgment were denied because the Schedule A Defendants have failed to appear. Denial of default judgment would therefore leave Aquapaw with no other means to vindicate its claims. *See Arias v. Wal-Mart Stores East, LP*, No. 19-cv-

05227, 2021 WL 4169398, at *4 (E.D. Pa. Sept. 14, 2021). Second, because the Schedule A Defendants have not appeared in this case, the Court cannot know what defenses they may have. The Court may therefore presume there are none. *See Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271 (E.D. Pa. 2014). Third, "culpable conduct" is that which is done "willfully or in bad faith." *Slater v. Yum Yum's 123 ABC*, No. 2:20-cv-00382, 2021 WL 2188599, at *6 (E.D. Pa. May 28, 2021) (citing *Chamberlain*, 210 F.3d at 164). The Schedule A Defendants' acceptance of the Complaint and failure to appear or respond constitutes willful and therefore culpable conduct. *See id.*

    **F.**    **Requested Relief**

        **1.**    **Permanent Injunction and Post-Judgment Asset Restraining Order**

A court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. In granting an injunction, a court should consider "(1) irreparable injury; (2) inadequacy of legal remedies; (3) the balance of hardships as between the plaintiff and defendant; and (4) the public interest." *2109971 Ont. Inc. v. Matrix Hosp. Furniture Inc.*, No. 21-11412, 2022 WL 154411, at *4 (D.N.J. Jan. 14, 2022) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

First, Aquapaw's right to exclude the Schedule A Defendants from infringing its patent would be irreparably harmed in the absence of a permanent injunction. *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent."). And Aquapaw's Complaint, taken as true, establishes that it is "suffering irreparable and indivisible injury." ECF No. 2 ¶ 11(k). Second, money damages alone are inadequate because the Schedule A Defendants' conduct violates Aquapaw's right to exclude others from infringing on its patent. *See Acumed LLC*, 551

F.3d at 1328 ("[I]nfringement may cause a patentee irreparable harm not remediable by a reasonable royalty."). Third, the balance of hardships favors Aquapaw because the Schedule A Defendants have admitted by their default that they are not legally entitled to produce, sell, or distribute the products. Meanwhile, Aquapaw is injured by unauthorized sales of products that infringe on its patent. Fourth, protection of intellectual property rights serves the public interest. *See Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (Fed. Cir. 1984). Aquapaw's request for a permanent injunction and post-judgment asset restraining order will therefore be granted.

### 2. Compensatory Damages

In the default judgment context, the court "must make a finding as to the amount of damages based on the evidence in the record." *Levitation Arts, Inc. v. Plox, Inc.*, No. CV 17-1476-MN, 2020 WL 2730905, at *3 (D. Del. May 26, 2020), *report and recommendation adopted*, No. CV 17-1476 (MN), 2020 WL 3103894 (D. Del. June 11, 2020). In a patent infringement case such as this, a court may "award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs." 35 U.S.C. § 284. One way of proving damages in a patent infringement case is the *Panduit* test. *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017). Under that test, a patentee is entitled to lost profit damages if it establishes "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Id.* at 1285.

Here, Aquapaw requested an award of lost profits under the *Panduit* test. ECF Nos. 84 at 5–6; 59 at 10–11. The Schedule A Defendants have admitted by their failure to respond to Aquapaw's requests for admissions (1) that there was demand for Aquapaw's products; (2) that there was an absence of acceptable non-infringing substitutes; and (3) that Aquapaw had

10

manufacturing and marketing capability to exploit the demand. ECF No. 57-2 ¶ 5. With respect to *Panduit's* fourth element—the amount of profit Aquapaw would have made but-for the Schedule A Defendants' infringement—Aquapaw's moving papers rely solely on unanswered requests for admission to calculate Aquapaw's lost profits. ECF Nos. 84 at 5–6; 59 at 9–10. After the Court held oral argument on Aquapaw's damages request, Aquapaw submitted a supplemental statement on damages as well as purported additional evidence supporting its claimed damages. ECF No. 96. Specifically, as Aquapaw's counsel explained in a declaration, Aquapaw prepared "a spreadsheet indicating the amounts of funds restrained and total sales of infringing products for each Defendant as last reported by the relevant online platform, the admitted gross sales, the stolen profits, [and] the corrective advertising expense." ECF No. 96-2 ¶ 19. However, that spreadsheet does not appear to contain the "total sales of infringing products for each Defendant as last reported by the relevant online platform." *Id.*; *see* ECF No. 96-18. And the lost profits calculation provided in Aquapaw's supplemental statement on damages does not cite any sources for numbers used and appears to be identical to the calculation Aquapaw initially performed based only on unanswered requests for admissions. *Compare* ECF No. 96 at 12 (relying on an assumed 30,000 units sold over a two-month period at $20 profit per unit, with no sources cited), *with* ECF No. 59 at 9–10 (relying on the same figures, and citing unanswered requests for admission as the source, including an admission regarding the profit per unit of an "Infringing Product" as opposed to Aquapaw's patented product). In sum, it does not appear that Aquapaw has provided any additional evidence supporting the amount of damages it claims as lost profits, and the Court declines to base a damages award on asserted lost profits.

However, Aquapaw has provided evidence to support a damages award based on a reasonable royalty. Specifically, it has provided an expert report from Paul N. Holmes, "an expert in Consumer Product Licensing with over twenty[-]four years in the field." ECF No. 96-1 at 1.

11

Mr. Holmes reviewed documents provided to him by Aquapaw's legal counsel, including Aquapaw's "Sales History," and opined on the "fair value for the harm produced" by the Schedule A Defendants' conduct. *Id.* at 1–2. In particular, Mr. Holmes calculated the estimated royalty Aquapaw would have received in a hypothetical scenario where it licensed its Slow Treater device to a Schedule A Defendant under either a promotional license or a standard consumer product license. *Id.* at 2–6. Such hypothetical royalties are payable as an alternative to a plaintiff's lost profits. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining.").

Courts awarding hypothetical royalties as damages typically consider fifteen factors set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), to determine whether the requested royalty is reasonable. *See Lucent Techs.*, 580 F.3d at 1324–25. However, consideration of those factors is not mandatory, and not every factor need be considered in a given case. *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("[T]his court does not endorse *Georgia–Pacific* as setting forth a test for royalty calculations, but only as a list of admissible factors informing a reliable economic analysis."); *Lucent Techs.*, 580 F.3d at 1335 (examining the "*relevant Georgia–Pacific* factors") (emphasis added). Ultimately, calculating any hypothetical royalty "necessarily involves an element of approximation and uncertainty." *Lucent Techs.*, 580 F.3d at 1325 (quotation omitted).

Here, Mr. Holmes' report does not expressly reference the *Georgia-Pacific* factors. *See* ECF No. 96-1. It does, however, touch on issues covered by certain factors and explain why they support Mr. Holmes' conclusions. *See, e.g., id.* at 2 (explaining that a promotional license would typically be accompanied by a flat-fee to account for Aquapaw's subsequent inability to compete with its licensees); *Sherwin-Williams Co. v. PPG Indus., Inc.*, No. CV 17-1023, 2020 WL

12

1283465, at *7 n.8 (W.D. Pa. Mar. 18, 2020) (Conti, J.) (listing the *Georgia-Pacific* factors, including the "nature and scope of the license" and whether the parties "are competitors in the same territory in the same line of business"). On balance, while Mr. Holmes' report is not comprehensive, the Court finds it helpful and sufficient to determine Aquapaw's damages in the absence of adversarial testing. *See* 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to the determination of damages."); *Levitation Arts*, 2020 WL 2730905, at *3 (stating that at the default judgment stage, a court's damages award must be "based on the evidence in the record").

Accordingly, the Court finds that Aquapaw is entitled to $530,000 in compensatory damages per Schedule A Defendant, based on Mr. Holmes' calculation of the low-end value of the guaranteed royalty Aquapaw would have received from a promotional license agreement between Aquapaw and a Schedule A Defendant. *See* ECF No. 69-1 at 2, 5–6.

### 3.    Treble Damages

A district court may increase damages awarded in cases of patent infringement up to three times the amount found or assessed. 35 U.S.C. § 284. But that discretion is limited: courts may generally award enhanced damages only in egregious cases of willful misconduct. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016). Even after a finding of willfulness, "the decision to enhance damages is a discretionary one that the district court should make based on the circumstances of the case." *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016) (affirming the jury's finding of willfulness but remanding to the district court to decide in its discretion whether damages should be trebled).

Here, Aquapaw suggests that enhanced damages are appropriate because of Defendants' "intentional infringement." ECF No. 59 at 10. The Complaint, taken as true, establishes that the Schedule A "Defendants [were] actively participating in a conspiracy to distribute and sell

13

Infringing Products." ECF No. 2 ¶ 8. And the Schedule A Defendants have also admitted that they knew about Aquapaw's patent before they began their infringing behavior, yet intentionally infringed anyway. ECF No. 57-2 ¶ 5. Therefore, in light of the Schedule A Defendants' willful violation of Aquapaw's patent, the Court will award Aquapaw treble damages.

### 4. Order Authorizing the Release and Transfer of Frozen Assets

Other courts in similar cases have held that transfer of defendants' frozen assets to satisfy judgment was warranted and within the court's authority. *See, e.g.*, *Golden Goose Deluxe Brand v. Aadct Official Store*, 19 Civ. 2521, 2020 WL 3167031, at *7 (S.D.N.Y. June 15, 2020). Aquapaw's request for an order authorizing the release and transfer of the Schedule A Defendants' frozen assets to satisfy the damages awarded will therefore be granted.

## IV. Conclusion

For the reasons set forth above, Aquapaw's Motion, ECF No. 84, will be GRANTED. An appropriate Order will follow.

DATED this 12th day of August, 2025.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record